La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
La controversia que este Tribunal debe atender se circunscribe a dos cuestionamientos principales. Primero, si la indemnización condicionada a un denominado “Acuerdo de Relevo”, que la compañía Pfizer, Inc. le otorgó al Sr. Francisco J. Orsini García al separarlo de su empleo, está exenta del pago de contribuciones y, segundo, si esta compensación puede ser clasificada como “mesada”. A continuación se ex-ponen los hechos pertinentes a la controversia.
HH
Luego de dieciocho años de servicios para la compañía farmacéutica Pfizer, el señor Orsini García fue separado de su empleo el 20 de octubre de 2003. Como parte del proceso de despido, Pfizer le ofreció al señor Orsini García una in *608 demnización a cambio de que éste firmara un documento titulado “Acuerdo de Relevo”. En este escrito, el señor Orsini García relevaba a Pfizer de cualquier reclamación, conocida o por conocer, que estuviera relacionada con su empleo y su terminación. Concretamente, el acuerdo imposibilitaba que el señor Orsini García pudiera presentar ante la judicatura del país alguna reclamación relacionada con leyes laborales locales o federales.
El mismo día del despido, el señor Orsini García firmó el acuerdo y Pfizer le otorgó la compensación de $163,323.66, no sin antes descontarle $32,345 correspondientes a la partida de la contribución sobre ingresos. Para el año fiscal 2003-2004, el señor Orsini García presentó sus planillas de contribución sobre ingreso e incluyó en ellas la partida de $163,323.66. El 13 de septiembre de 2004, el señor Orsini García sometió una planilla enmendada, en la cual eliminó esta partida y determinó una contribución total de $33,479. Además, le solicitó al Departamento de Hacienda que le reintegrara la cantidad de $32,345 descontada por Pfizer, por considerar que correspondía a una contribución pagada en exceso. Su petición la sustentó en que los $163,323.66 no constituían salarios y, por lo tanto, no eran tributables. Por eso, la retención en el origen que había realizado el patrono Pfizer, por la suma de $32,345, era improcedente.
La Oficina de Apelación Administrativa del Departamento de Hacienda no atendió la solicitud de reintegro del señor Orsini García, sino que el 22 de agosto de 2006 emitió una “Notificación Final de Deficiencia Administrativa” en la cual expuso lo siguiente: “el caso de epígrafe ha sido resuelto según se demuestra en los anejos que se acompañan".(1) Por esta razón, el señor Orsini García presentó una demanda ante el Tribunal de Primera Instancia el 19 de septiembre del 2006. En ésta, argumentó que la compensación de $163,323.66 que le había conferido Pfizer, *609 producto de la firma del acuerdo, no constituía salario, no equivalía a remuneración por labores o servicios prestados ni tampoco era un sustituto de sueldo. En vez, se trataba de una indemnización por daños y perjuicios, a causa de la violación por Pfizer de varias leyes laborales. Según esta premisa, el señor Orsini García planteó que no se requería pagar contribuciones por este tipo de indemnización.
Por su parte, el Sr. Juan C. Méndez, Secretario de Hacienda, representado por el Procurador General, le solicitó al foro de instancia que desestimara la controversia. Adujo que el pago recibido por el señor Orsini García no era una indemnización según la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a et seq.), sino una compensación por cesantía, por lo que constituía un ingreso tributable. El 27 de agosto de 2007, notificada el 6 de septiembre del 2007, el tribunal de instancia desestimó el caso y determinó que la compensación económica recibida por el señor Orsini García era tributable, porque era producto de un contrato de transacción, en el cual se concedió un relevo de responsabilidad a favor de la compañía Pfizer. Concluyó que no se trataba de una compensación por una lesión personal o enfermedad y mucho menos una indemnización por daños y perjuicios al amparo del Artículo 1802 del Código Civil, 31 L.P.R.A. see. 5141.
El señor Orsini García recurrió entonces ante el Tribunal de Apelaciones. El 29 de noviembre de 2007, el foro apelativo emitió su sentencia, notificada el 5 de diciembre de 2007, y revocó la determinación del Tribunal de Primera Instancia. Específicamente, el tribunal apelativo ordenó al Secretario de Hacienda que reembolsara la contribución que el señor Orsini García había pagado por la compensación que había recibido en ocasión de su despido. Entendió el tribunal que las enmiendas realizadas a la Ley Núm. 80 de 30 de mayo de 1976, supra, y al Código de Rentas Internas, según las cuales no se retendrá en el origen la porción correspondiente al pago de contribuciones sobre el dinero *610 recibido por un despido injustificado, implicaban necesariamente que esta compensación está exenta del pago de tributo.
Inconforme, el 27 de diciembre de 2007 el Secretario de Hacienda presentó un recurso de apelación, el cual acogimos como certiorari. En ese recurso, el Procurador General plantea que el Tribunal de Apelaciones erró al resolver que la compensación concedida a un empleado por razón de su despido no es tributable. Considera que el foro apelativo sustituyó el criterio del Legislador, en cuanto a las exenciones contributivas, y desatendió la norma de deferencia que impera en la interpretación de las leyes tributarias que hace el Secretario de Hacienda, así como la norma de interpretación restrictiva de las leyes fiscales. El señor Orsini García sometió su alegato en oposición el 15 de julio de 2008. Considerada la posición de ambas partes, procedemos a resolver.
r-H H-i
A. El criterio de interpretación aplicable
Nuestro ordenamiento positivo está conformado por mía diversidad de normas jurídicas. Por un lado, se encuentran las normas generales o estatutarias, entre las cuales se incluyen los reglamentos y, claro está, la Constitución, que es nuestra Ley Suprema. Por otro lado, están las normas particulares establecidas en los negocios jurídicos y, finalmente, las normas individualizadas que surgen como resultado de las sentencias que dictan los tribunales.(2)
La Asamblea Legislativa tiene la encomienda constitucional de crear la normativa estatutaria de nuestro país. De ordinario, estos estatutos son elaborados en forma *611 general, amplia y abstracta, aunque surgen para atender situaciones y problemas concretos relacionados al desarrollo económico, social, cultural, académico y político de nuestra sociedad en una época histórica en particular.
Esto implica que, una vez la Legislatura cumple con su misión de crear leyes, los tribunales asumen su deber, también constitucional, de transformar los términos abstractos en preceptos concretos, palpables e individualizados. En este proceso, los magistrados tienen la encomienda de dilucidar el significado del estatuto y hacer valer la voluntad legislativa. Para cumplir este objetivo, hemos señalado que se debe “ ‘penetrar la superficie verbal del problema, ante nos, precisar el diseño y la razón de ser de las disposiciones legales, sopesar los intereses en juego, para intentar acercarnos a la interpretación más justiciera’ ”.(3) En este sentido es que Recaséns Siches propone que el único método de interpretación jurídica debe ser “la lógica de lo razonable o de lo humano”.(4) Como proceso lógico al fin, responde a criterios objetivos, según explica De Castro Cid:
Se sostiene que el juez, al determinar cuál sea la norma aplicable al caso singular, se debe atener a criterios objetivos, criterios que son, ante todo, las valoraciones que inspiran al or-den jurídico positivo en su totalidad, es decir, tomando en cuenta no sólo los textos legales y reglamentarios sino atendiendo también a las valoraciones en que se basa ese orden jurídico positivo en un determinado momento y a los efectos prácticos que dichas valoraciones deben producir sobre el caso concreto. Esos criterios son, además las convicciones sociales vigentes precisamente en el presente, las cuales condicionan, circunscriben e impregnan el orden jurídico positivo. Entre esos criterios figura asimismo la idea de que los requerimientos de justicia se tiene [n] en la sociedad y en la época concreta *612 en que se vive. Y todos esos criterios son objetivos, tan objetivos como lo pueden ser los textos legales y reglamentarios.(5)
A fin de cuentas, nadie puede comprender e interpretar la significación de cualquier legislación con la mera lectura de su texto, sin conocer el contexto histórico, cultural y social en el cual se aprobó. Se requiere, entonces, incluir en el análisis no tan solo los elementos intrínsecos a la legislación, como son su exposición de motivos o sección de definiciones, sino también ciertos factores extrínsecos a ésta. Entre éstos, los tratadistas destacan: (1) los sucesos o puntos de vista contemporáneos a su aprobación; (2) la política y el orden público; (3) los informes de la comisión legislativa que estudió el proyecto de ley; (4) el diario de sesiones, los anteproyectos, en fin, el historial legislativo; (5) la historia de la ley; (6) el momento de su aprobación; (7) las realidades sociales, políticas y económicas en el momento de hacerse la interpretación, y (8) las condiciones existentes y costumbres arraigadas cuando se aprobó la ley.(6) También, sirven, según explica Fiore: “la comparación de las leyes, de la doctrina y de la jurisprudencia”.(7)
Hemos reconocido que el sentido común de los jueces es otro factor extrínseco que éstos pueden utilizar para descifrar la intención legislativa de los estatutos. No hay regla de hermeneútica que lo impida,(8) puesto que las acciones de los foros judiciales, incluso la interpretación del *613 texto de una ley, siempre deben responder al objetivo de hacer prevalecer la verdadera justicia.(9)
Este Tribunal ha validado constantemente el tipo de interpretación que tiene como finalidad identificar los propósitos que persigue una ley, de forma tal que ésta se ajuste a la política pública que la inspira.(10) A este tenor hemos expresado, enfáticamente, que “las leyes hay que interpretarlas y aplicarlas en comunión con el propósito social que las inspira, sin desvincularlas de la realidad y del problema humano que persiguen resolver”.(11) Todo, para evitar que una interpretación literal lleve a resultados absurdos.(12) Además, según explica Ihering, “el fin es el creador de todo [d]erecho” y “no hay norma jurídica que no deba su origen a un fin, a un propósito, esto es, a un motivo práctico”.(13)
*614 Los estatutos se interpretan distintamente seg(in la razón por la cual fueron creados. Si el objetivo legislativo es beneficiar a los individuos, al Estado o reparar alguna situación de injusticia en particular, la interpretación deberá ser liberal. Por el contrario, si el objetivo está dirigido a limitar los derechos del Estado o de la sociedad en general, la interpretación debe ser restrictiva. La idea de estas formas de interpretación es facilitar que se cumpla con la finalidad de cada legislación.
Ahora, esta controversia nos obliga a cuestionamos qué tipo de interpretación, restrictiva o liberal, prevalecerá cuando están en contraposición una legislación que beneficia a la sociedad, en específico a la masa trabajadora, y otra que favorece al Estado. En concreto: ¿cómo armonizamos la finalidad legislativa de la Ley de Contribución sobre Ingresos de 1994, que persigue favorecer al Estado interpretando de forma amplia el concepto ingreso,(14) y restrictivamente el derecho de los contribuyentes a las exclusiones sobre esta partida, con la interpretación flexible de las leyes laborales, como por ejemplo, aquella relacionada a la indemnización por despido, que siempre son en beneficio de la parte más débil, es decir, de los trabajadores? Se trata de conciliar la política fiscal del país, que está dirigida a obtener más ingresos para sus arcas, con la premisa de que las indemnizaciones por despido y otras indemnizaciones otorgadas por los patronos en cumplimiento de alguna ley laboral, tienen el objetivo de reparar el daño ocasionado al obrero por acciones discriminatorias del patrono o por la pérdida del empleo.
La legislación laboral de Puerto Rico está orientada a promover la justicia social de la clase trabajadora, garantizando la mayor protección de sus derechos *615 laborales.(15) Su esencia es remedial o reparadora. Por lo cual, su interpretación judicial debe ser liberal y amplia, para que se puedan alcanzar los objetivos que la originaron.(16) En este proceso interpretativo, toda duda en cuanto a la aplicación de una disposición legal laboral deberá resolverse a favor del empleado.(17)
Contrariamente, los estatutos contributivos relacionados con las exclusiones del ingreso bruto se interpretan restrictivamente.(18) Esta doctrina de interpretación, según el licenciado Meléndez Carrucini, está sustentada en dos principios fundamentales:
Primero, el que propone que el legislador, al tributar los ingresos, tuvo el propósito deliberado de hacerlo en su sentido amplio y abarcador ....
Segundo, las exclusiones del ingreso bruto requieren de una disposición estatutaria específica que las conceda.(19)
Esta regla de interpretación estricta de las exenciones contributivas se fundamenta, á su vez, en que éstas son privilegios excepcionales que concede el Estado y toda duda sobre su existencia debe resolverse en su contra.(20) *616 Por lo tanto, para conceder una exención contributiva, ésta debe existir concretamente, no puede ser inferida.(21)
Sin embargo, hay que tener presente que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones, al igual que toda legislación, deben recibir una interpretación razonable, tendiente a llevar a efecto el propósito y la intención del legislador.(22) En otras palabras, las exenciones contributivas no se interpretarán restrictivamente si la intención legislativa de concederlas es clara e inequívoca, pues ello derrotaría el propósito del estatuto.(23)
Más concretamente, Meléndez Carrucini argumenta que “el uso de la doctrina de la interpretación restrictiva de las exenciones como un principio dogmático y aforístico arriba con frecuencia a conclusiones que no encuentran verdadero apoyo en el texto de la ley, ni en su historial y su intención”.(24) Hemos validado esta perspectiva al resolver que un tribunal no debe interpretar la legislación contributiva en forma extensiva, sino que debe interpretarla en forma justa, según sus propios y expresos términos.(25) Esto implica que si el propósito de imponer contribuciones no es claro, la duda deberá resolverse en contra de su imposición.(26)
*617 En este caso, no está claro si la ley excluye del ingreso bruto la indemnización que se otorga para reparar el daño ocasionado por el despido, sea ésta concedida como parte de una obligación contractual, es decir, la transacción o la compensación por cesantía (severance payments) o legal, como lo es la mesada y la indemnización progresiva. Esta exclusión no está expresamente establecida en la Ley de Contribuciones por Ingresos de 1994.
Sin embargo, si por esa sola razón aplicamos la regla general de interpretación restrictiva de las exenciones, de forma automática y literal, para concluir que la indemnización por despido es tributable, entonces, nos apartamos de la interpretación liberal que siempre le hemos concedido a la legislación obrera. Acogemos, en vez, la pauta hermenéutica de realizar una interpretación razonable que nos permita descifrar la finalidad del estatuto contributivo. Sobre este asunto abundaremos en la parte C de esta opinión.
B. La protección del empleo y las modalidades indemnizatorias del despido
Los contratos de trabajo son la forma de contratación pertinente a las relaciones sociales que se establecen entre quien emplea y el empleado para realizar un trabajo o servicio. Más técnicamente, se trata del contrato “que tiene por objeto la prestación continuada de servicios privados y con carácter económico, y por el cual una de las partes —el patrono, empresario o empleador— da remuneración o compensa a cambio de disfrutar o servirse, bajo su dependencia o dirección, de la actividad profesional de otra, denominada el trabajador”.(27)
Al contrato de trabajo siempre se le ha visuali *618 zado como un típico contrato de adhesión.(28) Esto debido a que el patrono es quien elabora unilateralmente las disposiciones del contrato, mientras que la única función del empleado es aceptar lo que se le propone, porque no tiene la posibilidad de exigir mejores términos. Puesto que se trata de una relación en la que el trabajador es la parte más débil, el Estado se ha encargado de aprobar una variedad de leyes protectoras del trabajo, cuya finalidad es proteger el empleo, regular el contrato de trabajo y asegurar la salud y seguridad del obrero.(29) Entre la legislación relativa a la protección del empleo se encuentra la que se encarga de reglamentar el despido.
Frente al despido, que es una de las formas de extinguir el contrato de trabajo, debemos ponderar dos intereses disímiles; por un lado, el interés del empleado en conservar su trabajo y, por el otro, el derecho que tiene el patrono de determinar cuáles recursos, humanos y materiales, formarán parte de su negocio. De esta realidad, en la que se confrontan dos fuerzas, una dirigida a proteger la permanencia de la relación obrero y empleador, y otra a flexibilizar la ruptura del contrato de trabajo, surge la necesidad de intervención estatal para lograr la estabilidad del empleo.
Entre los estudiosos del derecho laboral hay distintas teorías sobre la estabilidad del empleo. Unos se suscriben a una concepción amplia de la estabilidad del contrato de trabajo, la cual persigue que el trabajador pueda permanecer en su empleo hasta el momento de su jubilación. Esta perspectiva es compatible con la atribución al trabajador de un derecho propietario sobre el empleo. Mientras, la concepción estrecha de la estabilidad, cuyo enfoque es más conservador, lo que busca es controlar o frenar el despido, de forma que éste sólo se efectúe ante una causa prevista expresamente *619 en la ley.(30) Indistintamente de la noción de estabilidad del empleo aplicable, es necesario establecer que la finalidad de cada una de éstas es proteger a los empleados de los despidos injustificados o arbitrarios.(31)
En Puerto Rico coexisten estatutos que responden a ambas visiones sobre la estabilidad en el empleo. Por un lado, se encuentra la legislación laboral que proscribe el despido y autoriza que el trabajador sea reinstalado en su empleo, la cual responde a una concepción amplia.(32) Por otro lado, tenemos aquella legislación que reglamenta el despido injustificado, cuando éste no está prohibido, y concede como remedio único una indemnización económica sin posibilidad de reinstalación. Esta puede ser ubicada en una concepción estrecha de la estabilidad. Sobre esta normativa es que debemos centrar nuestra atención para resolver la presente controversia.
Nuestra normativa laboral sobre el despido injustificado sólo aplica a los empleados del sector privado. Su evolución histórica tuvo sus inicios en el Código de Comercio dé 1886, posteriormente derogado, donde se reconoció, por primera vez, aunque de forma limitada, el derecho de un empleado a ser indemnizado cuando su patrono lo despedía injustificadamente. Este estatuto proveía para que todo patrono que despidiera “sin justa causa” a un empleado de *620 comercio, tuviera que pagarle una compensación por despido.(33)
Estos derechos se hicieron extensivos a todos los empleados, a través de la Ley Núm. 43 de 28 de abril de 1930.(34) Posteriormente, la Ley Núm. 50 de 20 de abril de 1949 mantuvo el esquema de la indemnización como remedio único por despido injustificado.(35) Además, se convirtió en el estatuto general de despido del país, porque su aplicación se extendió a todos los empleados, incluyendo a los del área comercial, al derogar, no tan sólo las leyes precursoras, sino la norma sobre el despido injustificado establecida en el Código de Comercio.(36)
La normativa actual del despido, contenida en lá Ley Núm. 80 de 30 de mayo de 1976, según enmendada,(37) aplica sólo a aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén con *621 tratados sin. un tiempo determinado; (2) reciban una remuneración, y (3) sean despedidos de su cargo, sin que haya mediado una justa causa.(38) Esta ley, igual que sus estatutos predecesores, no prohíbe de forma absoluta el despido de los empleados.(39)
No obstante, esta legislación protectora del trabajo mantiene los valores de la legislación que le precede porque se enfoca en: regular las relaciones obrero-patronales, proteger el derecho del trabajador a la tenencia de su empleo y evitar o desalentar las prácticas de despido injustificado.(40) Concretamente, el estatuto persigue que
... se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado desaliente la incidencia de este tipo de despido.(41)
Para alcanzar este objetivo, la Asamblea Legislativa definió la justa causa, como aquella que está vinculada al buen y normal funcionamiento de la empresa,(42) y aumentó la compensación por despido injustificado al incluir, además del pago de la mesada representativa de un mes de sueldo, “una indemnización progresiva equivalente a una semana por cada año de servicio”.(43) De esta forma, *622 el estatuto evita que un patrono despida a un empleado sin causa justificada. Además, le impone al patrono responsabilidad económica por despedir “sin justa causa” a un empleado y le provee al trabajador una indemnización que le permita subsistir, mientras encuentra un nuevo empleo.
Más recientemente, a través de la Ley Núm. 234 de 17 de septiembre de 1996, que enmienda a la Ley Núm. 80 de 1976, supra, se aumentó la indemnización por despido correspondiente a la mesada. El aumento se estableció mediante un pago escalonado de sueldo, de uno a tres meses, según los años de servicio del empleado en la compañía. (44) Además, en 2005 se duplicó el pago de la mesada y se estableció un pago escalonado, según los años de servicio, por la indemnización progresiva.(45)
Esta política pública, dirigida a desalentar los despidos injustificados, se sustenta en que sin la protección del empleo no son necesarios otros derechos laborales que, por definición, requieren una relación de trabajo y, claro, en que el trabajo tiene una función social trascendental tanto en el ámbito individual como en el colectivo. A esta realidad responde nuestra afirmación de que “el trabajo tiene un hondo significado ético, porque mediante éste la persona aporta al bien común y se autor[r]ealiza”.(46)
Como es patente, el patrono tiene una obligación legal de pagarle una indemnización al obrero que es despedido injustificadamente. Esa es su penalidad por despedir a un obrero “sin justa causa”. La finalidad de este tipo de *623 compensación se puede analizar desde dos perspectivas. Por un lado, la indemnización por mesada tiene el propósito de compensar el daño causado al obrero al habérsele despojado del modo de subsistencia. En ese sentido, la indemnización por mesada sustituye la pérdida del empleo. Mientras, la indemnización progresiva, que también se recibe en sustitución del empleo, tiene el doble objetivo de reconocer el tiempo dedicado por el obrero a la empresa y proveerle a éste una ayuda en lo que consigue otro trabajo. Por esto, nuestra posición ha sido constante en cuanto a que este tipo de indemnización persigue reparar los daños que le ha ocasionado al empleado el quedarse sin trabajo a causa de un despido injustificado, de forma que se le pueda brindar un remedio reparador.(47)
Por lo general, los patronos pagan este tipo de compensación, luego de un proceso judicial en el que se determina que el despido fue injustificado. Sin embargo, recientemente se ha desarrollado la práctica de pagar la mesada como resultado de un contrato de transacción, modalidad que, alegadamente, está presente en este caso. Debemos, pues, examinar el acuerdo y repasar los lineamientos del contrato de transacción.
En el "Acuerdo de Relevo” entre el señor Orsini García y la compañía Pfizer, Inc. se incluyeron veintidós cláusulas. Un análisis integrado de cada una de éstas nos permite observar y establecer, en lo pertinente, que: (1) la compensación por la pérdida del empleo, ascendente a $163,323.66, estaba condicionada a que el señor Orsini García firmara el relevo, es decir, si éste no lo hacía no recibiría ninguna indemnización por el despido; (2) a cambio del pago, el señor Orsini García renunciaría a cualquier potencial acción según varias leyes laborales estatales y federales, incluyendo la citada Ley Núm. 80 de 1976; (3) el acuerdo convenido no constituye una admisión de responsabilidad por parte de *624 Pfizer, (4) no se hacen constar los motivos por los cuales se cesanteó al señor Orsini García; (5) se mantendrá confidencial toda información relacionada con la terminación del empleo del señor Orsini García, y (6) si se declarase nula cualquier disposición del acuerdo, ésta se considerará eliminada, pero no se afectará la validez de las cláusulas restantes.(48)
El Código Civil dispone que a través de un contrato de transacción, “las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado”.(49) En ese sentido, la finalidad de este tipo de contrato es “evitar toda controversia entendida aquélla como divergencia, disputa o debate, esto es, como situación en la que se encuentran dos personas que sostienen tesis diferentes respecto a una determinada relación”.(50)
Los contratos de transacción pueden ser judiciales o extrajudiciales.(51) El primero se origina cuando las partes acuerdan eliminar una controversia, luego de haber comenzado un pleito litigioso, y solicitan incorporar la transacción al proceso judicial en curso. Distintamente, el segundo, que es el pertinente a nuestra controversia, se da cuando las partes acuerdan eliminar la controversia, antes de iniciar un pleito judicial, o cuando comenzado éste las partes transan, sin la intervención del tribunal.(52)
Para que un contrato de transacción exista deben concurrir tres elementos esenciales. Estos son: (1) una *625 controversia jurídica entre las partes, (2) la intención de los contratantes de componer el litigio, es decir, de eliminar las controversias y (3) las concesiones recíprocas de las partes.(53) Es por esto que se ha establecido que el contrato de transacción es bilateral, recíproco, oneroso y consensual, es decir, que surge por el mero consentimiento de las partes.(54)
No podemos olvidar que los acuerdos transaccionales deben interpretarse restrictivamente, puesto que conllevan la renuncia de derechos.(55) Así lo establece el Código Civil, al disponer que:
La transacción no comprende sino los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidas en la misma.
La renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre [la] que ha recaído la transacción.(56)
De más está decir que la posibilidad de la transacción de una controversia está supeditada al hecho de que una renuncia de derechos no puede ir contra la ley, el interés o el orden públicos. Al respecto, el Código Civil establece, en lo pertinente, que “los derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en peijuicio de tercero”.(57)
*626 En esta controversia, la compañía Pfizer, Inc. le otorgó al señor Orsini García una compensación por cesantía, a cambio de que éste relevara a la compañía de la aplicación de una variedad de leyes laborales estatales y federales, entre éstas, la citada Ley Núm. 80, según enmendada.(58) Ahora bien, para resolver esta controversia no es necesario expresarnos sobre la totalidad de la cláusula del contrato que dispone la renuncia a las leyes laborales mencionadas.(59) Más bien, nos basta evaluar si el trabajador puede renunciar a los derechos concedidos por la Ley Núm. 80 de 1976, supra. De entrada encontramos que la Asamblea Legislativa expresamente dispuso lo contrario, en *627 la Ley Núm. 16 de 21 de mayo de 1982 (29 L.P.R.A. sec. 185i), que enmendó la Ley Núm. 80 de 1976. Esta ley establece lo siguiente:
Se declara irremmciable el derecho del empleado que fuere despedido de su cargo, sin que haya mediado justa causa, a. recibir la indemnización que establece [el Artículo 1].
Será nulo cualquier contrato, o parte del mismo, en que el empleado renuncie a la indemnización a que tiene derecho de acuerdo a [esta Ley] .(60)
En este caso, el expediente no revela que se hubiera renunciado a la indemnización dispuesta por la Ley Núm. 80 de 1976, supra. Más bien, la compensación ofrecida por Pfizer y aceptada por el señor Orsini García se calculó sobre la base de los requisitos de la Ley Núm. 80. En efecto, no se ha suscitado controversia alguna en cuanto al pago de la “mesada” dispuesta en dicha ley. Concluimos, entonces, que el “Acuerdo de Relevo” entre la compañía Pfizer Inc. y el señor Orsini García se redujo a un contrato de transacción según la Ley Núm. 80 de 1976.
El Departamento de Hacienda aduce que lo que el señor Orsini García recibió no constituyó el pago de mesada, sino una indemnización por cesantía o por años de servicio, conocida en inglés como severance payment. Esta alegación nos requiere precisar los contornos de esta modalidad de pago por despido.
La profesora Mengod Gimeno precisa el concepto indemnización por los años de servicio o cesantía como “el derecho que tiene un trabajador a recibir una reparación pecuniaria por el daño originado por haber empleado su esfuerzo personal en beneficio de un patrón y no exclusivamente en el propio”.(61) La finalidad de este tipo de indemnización, también expresa la profesora Mengod Gimeno, es *628 dual. Por un lado, recompensa la fidelidad que ha tenido un empleado con la empresa para la cual trabajó por muchos años, mientras, por el otro, persigue compensar el menoscabo en la capacidad productiva del obrero en beneficio exclusivo de la compañía.(62) En esencia, su objetivo es reparar el daño ocasionado por el despido.
En Estados Unidos este tipo de compensación es concedido por muchas corporaciones, principalmente por las manufactureras, como parte de una política interna de personal.(63) Es decir, la compensación por los años de servicios o cesantía forma parte del paquete de beneficios que el patrono le ofrece a un empleado potencial para que acepte la oferta de empleo. En ese sentido, es pertinente señalar que, según hemos decidido, “[e]l manual de urna empresa que contiene las reglas y los reglamentos del trabajo y establece las normas, beneficios y privilegios que disfrutará el empleado, forman parte del contrato de trabajo”.(64) Por eso, la obligación patronal de este tipo de indemnización no surge de una actuación particular del patrono, sino que se activa por el mismo contrato de trabajo o, lo que es lo mismo, por una obligación contractual.
La indemnización por los años de servicio o cesantía se incorporó a nuestra normativa laboral a través de la Ley Núm. 278 de 15 de agosto de 2008, que enmienda el artículo 7 de la Ley Núm. 80 de 1976 (29 L.P.R.A. see. 185g). Esta legislación define este tipo de compensación como especial, concedida por el patrono al empleado cuando éste es despedido a causa de un cierre parcial, to *629 tal, por reorganización o por cambios tecnológicos de la compañía.
Vemos, pues, que todas las modalidades indemnizatorias del despido tienen la misma finalidad de reparar el daño que provoca la pérdida de un empleo. No obstante, se diferencian entre sí respecto al tipo de obligación por la cual el patrono tiene que responder.
La “mesada” es producto de una obligación legal que tiene el patrono de indemnizar a un empleado por despedirlo injustificadamente. De ordinario, este tipo de compensación se obtiene luego de un proceso judicial. Sin embargo, los patronos han optado por transar el pago de esta indemnización, mediante los denominados “Acuerdos de Relevo”. Esta modalidad de compensación por el despido responde a una obligación contractual, con la diferencia de que esta clase de contrato, por su naturaleza transaccional, está supeditado a que ambas partes consientan a las concesiones recíprocas. Además, para que sean válidos, estos acuerdos deben cumplir con el pago total de la “mesada”, porque el derecho a ésta no es renunciable. Por último, la obligación de pagar una compensación por despido o severance pay también es contractual, porque surge de las políticas o manuales internos de la empresa. Sin embargo, ésta no tiene que cumplir con el pago total de la mesada ni se requiere que el empleado dé algo a cambio para recibirla, como en este caso, donde se requiere al señor Orsini García la renuncia a los derechos que le brindan las leyes laborales mencionadas.
La indemnización por despido recibida por el señor Orsini García no fue concedida como resultado de un trámite judicial. Tampoco fue producto de la política interna de Pfizer. Por lo tanto, es forzoso concluir que ésta fue otorgada por el patrono mediante un contrato típico de transacción, en el cual ambas partes se liberaron de los gastos, las molestias, las tardanzas y la incertidumbre que todo litigio genera, a cambio, de que el señor Orsini García re *630 cibiera el pago de la “mesada” y Pfizer, Inc., obtuviera el puesto hasta entonces ocupado por el empleado.
C. La aplicación de la normativa contributiva a la indemnización por despido
La responsabilidad de definir y establecer la política pública económica y fiscal del país corresponde a la Rama Ejecutiva. Sin embargo, la viabilidad de esa política pública fiscal sólo es posible a través de los estatutos contributivos que elabora la Asamblea Legislativa. A esos efectos, nuestra Constitución dispone que:
El poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios, se ejercerá según se disponga por la Asamblea Legislativa y nunca será rendido o suspendido ....(65)
Esta es la facultad más fundamental de los poderes públicos y gubernamentales, esencial a la subsistencia y para la supervivencia de la soberanía del Estado.(66) Ante esta responsabilidad constitucional, la Rama Legislativa ha aprobado, a través de los años, diversas leyes contributivas cuyo tributo, denominado “progresivo”, se aumenta conforme incrementa el ingreso tributable de las diversas clases de contribuyentes que están sujetos a la contribución sobre ingreso.(67)
Como resultado de la reforma contributiva de 1994, el sistema contributivo de nuestro país está integrado en un solo documento, el Código de Rentas Internas de 1994, que recoge toda la legislación contributiva que *631 antes se encontraba dispersa.(68) Esta reforma estuvo enmarcada en varios principios u objetivos principales que son, en lo pertinente: (1) atender el reclamo de la clase media respecto al pago justo de sus contribuciones; (2) imponer contribuciones en consonancia con la capacidad de pago de las personas; (3) generar menos distorsiones en el sistema económico y social.(69)
A pesar de estos principios inspiradores, la tributación es “una institución social que grava la economía privada de los ciudadanos”.(70) Por eso, la contribución sobre ingreso es el impuesto que más controversia origina entre el Departamento de Hacienda y el contribuyente. Siendo ello así, siempre surgen interrogantes entre los contribuyentes respecto a si una partida constituye o no “ingreso” o “ingreso bruto” para fines contributivos. Este cuestionamiento es sumamente importante, porque el “ingreso bruto” es el punto de partida para calcular el “ingreso neto tributable”.
El Código de Rentas Internas de 1994 provee una definición general y amplia que compendia una pluralidad de partidas constitutivas del concepto “ingreso bruto”. Esta definición estatutaria establece lo siguiente:
“Ingreso bruto” incluye ganancias, beneficios e ingresos derivados de sueldos, jornales o compensación por servicios personales (incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico, de cualquier estado de la Unión, de los Estados Unidos, o de cualquier subdivisión política de los mismos, o de cualquier subdivisión política de los mismos, o de cualquier agencia o instrumentalidad de cualesquiera de las mencionadas entidades) de cualquier clase y cualquiera que sea la forma *632 en que se pagaren, o de profesiones, oficios, industrias, negocios, comercio o ventas, o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedades, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad y ganancias o beneficios e ingresos derivados de cualquier procedencia. (Énfasis suplido.)(71)
En esencia, esta definición contiene, según el licenciado Meléndez Carrucini, cinco conceptos de ingresos: (1) “ídompensación por servicios personales prestados”-, (2) “ingreso de Industrias y Negocios”; (3) “operaciones en propiedad”; (4) “[i]ngreso de propiedad y valores” y (5) “residuoingreso de cualquier procedencia”. (Enfasis suplido.)(72) Al referirse a la clasificación de ingreso residual, Meléndez Carrucini enfatiza en que mediante este lenguaje se recoge la definición misma de lo que constituye un ingreso bruto; es decir, ganancias, beneficios o ingresos.(73) En otras palabras, para que una partida sea clasificada como “ingreso bruto” deberá ser ganancia, beneficio o ingreso producto del trabajo o del capital.
Por su parte, el licenciado Tirado Viera propone tres elementos particulares para determinar si una partida tributa o no. Éstos son, primeramente, “que la partida constituya una acreencia de capital”, luego, que no esté expresamente excluida como un ingreso bruto por la ley o el reglamento y, finalmente, “que la partida sea realizada por el contribuyente”.(74) Aplicados estos criterios a un contrato de trabajo, encontramos que la acreencia de capital es el sueldo o salario que obtiene un trabajador. Mientras, la denominada realización de la partida se hace patente con la acción del patrono de transferirle al empleado esta compensación por los servicios prestados.
*633 Como regia general, en una relación de patrono y empleado se presume que cualquier tipo de compensación que reciba un trabajador de su empleador será en resarcimiento de la labor realizada y, como resultado obvio, un ingreso tributable.(75) Sin embargo, esta presunción desaparece si la compensación al trabajador no cae en la definición general de ingreso bruto. Es decir, éste no es “ganancia, beneficio e ingreso derivados de sueldos, jornales o compensación por servicios personales” o si la compensación tampoco es “una ganancia, beneficio e ingreso derivado de cualquier procedencia”.(76) Si no se trata de ninguno de estos supuestos, el empleado no tendrá que tributar por la indemnización otorgada por el patrono. Es decir, si se determina que la compensación no constituye salario o sueldo, automáticamente habrá que examinar si se puede clasificar como una ganancia, beneficio o ingreso proveniente de cualquier procedencia. Si se concluye que la compensación corresponde a uno de los dos tipos de ingresos mencionados, será necesario examinar si el obrero, que recibe la compensación, puede beneficiarse de una de las exclusiones o exenciones contributivas, de manera que no tenga que tributar por ésta.
Es importante establecer, como elemento de la primera parte de este análisis, que el que una partida esté exenta de la retención contributiva en el origen, porque no constituye salario, no implica que también resultará exenta de contribución.(77) Ambos conceptos, la contribución y la retención en el origen, tienen acepciones e implicaciones distintas.
Por un lado, la contribución es la porción que el *634 Estado, al estructurar su sistema tributario, determina que deben aportar anualmente los ciudadanos, las sociedades o las corporaciones, en razón de sus ingresos.(78) Es el nombre “que se da al tributo que importa la prestación obligatoria debida en razón de beneficios individuales o de grupos sociales, derivados de la realización de obras públicas o de actividades especiales del Estado”.(79) En otras palabras, es lo que facilita que se puedan proveer todos los servicios que el gobierno le brinda a la comunidad en general.
Mientras, por otro lado, la retención de la contribución en el origen es una responsabilidad legal que recae sobre aquellas personas que realizan pagos de salarios, principalmente, u otros renglones constitutivos de ingresos.(80) El Código de Rentas Internas de 1994 impone a los patronos la obligación de retener contribución en el origen en los casos de salario. En cuanto al término salario, el estatuto limita su definición en la forma siguiente:
... [T¡oda remuneración por servicios prestados por un empleado para su patrono, y toda remuneración en concepto de pensión por servicios prestados, incluyendo el valor en dinero de toda remuneración pagada por cualquier medio que no sea dinero .... (Énfasis suplido.)(81)
No toda remuneración es un salario. Por eso, el mismo estatuto excluye de la definición de salario, y por ende de la retención en el origen, la indemnización que un *635 patrono tiene que pagarle a un trabajador cuando lo despide sin justa causa, según dispone la Ley Núm. 80 de 1976, según enmendada, supra.(82) Esta exclusión a la retención se estableció mediante la Ley Núm. 2 de 6 de octubre de 1987, que enmendó a esos efectos la Ley de Contribuciones sobre Ingresos de 1954.(83) De esa forma, se complementó y armonizó lo que disponía la Ley Núm. 16 de 21 de mayo de 1982, que enmendó la Ley Núm. 80 de 1976, para establecer que no se podría realizar descuento de nómina a la indemnización por un despido injustificado.(84) El fundamento de la Asamblea Legislativa para enmendar esta legislación laboral fue que este tipo de indemnización “no se considera salario y sí una compensación por los daños ocasionados por el despido injustificado”.(85)
En Alvira v. SK & F Laboratories Co., 142 D.P.R. 803 (1997), sostuvimos enfáticamente que la mesada no es un salario, sino el resarcimiento de un daño producto del despido injustificado, por lo cual no puede es-tar sujeta a ningún descuento de nómina, incluso el del Seguro Social federal. Nuestra posición estuvo fundamentada en que un análisis contrario podría desvirtuar el noble propósito que persigue la Ley Núm. 80.(86) La Guía Revisada para la aplicación de la Ley Núm. 80, supra, reitera esta interpretación que es coherente con las disposiciones *636 de la propia Ley Núm. 80.(87) En específico este estatuto dispone:
Todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, designado en lo sucesivo como establecimiento, donde trabaja mediante remuneración de alguna clase contratado sin tiempo determinado, que fuere despedido de su cargo sin que haya mediado una justa causa, tendrá derecho a recibir de su patrono en adición al sueldo que hubiere devengado ....
(a) El sueldo correspondiente a un mes por concepto de indemnización, si el despido ocurre dentro de los primeros cinco (5) años de servicio; el sueldo correspondiente a dos (2) meses si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a tres (3) meses si el despido ocurre luego de los quince (15) años de servicio;
(b) una indemnización progresiva adicional equivalente a una semana por cada año de servicio. (Enfasis suplido.)(88)
Sobre esto el licenciado Acevedo Colom expresa lo siguiente:
La indemnización por despido injustificado que dispone la Ley Núm. 80, supra, no surge por concepto de servicios prestados por el empleado, pues una persona puede prestar servicios para su patrono durante tiempo ilimitado y no tendrá derecho a recibir la misma sino media el despido sin justa causa. Tampoco tendrá derecho a recibirla si se acoge al retiro o jubilación o cesa en su empleo por causa justificada. Es el acto del patrono de despedir al empleado sin justa causa lo que da lugar a recibir la indemnización mencionada.(89)
El Código de Rentas Internas de 1994 establece claramente que lo único que no se considerará un salario, para propósitos contributivos, es la indemnización por un despido injustificado. No obstante, esto no significa que es *637 imperativo recurrir a los tribunales para que se determine, sin lugar a dudas, que, en efecto, el despido fue injustificado y que, por lo tanto, la compensación recibida no es un salario y no está expuesta a la retención en el origen. Es decir, no se requiere que se determine en un proceso judicial que el despido fue ilegal e injustificado, para beneficiarse del estatuto contributivo.
La indemnización por cesantía o años de servicios (severance pay) también está exenta de retención en el origen. Esta conclusión es consecuente con la Ley Núm. 278 de 15 de agosto de 2008,(90) que establece que no estarán sujetos a descuento de nómina las indemnizaciones por cesantía, años de servicios o cualquier cantidad de dinero que el patrono le otorgue a los empleados por:
(d) Cierre total, temporero o parcial de las operaciones del establecimiento.
(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.(91)
Durante el proceso de evaluación de esta medida, el Departamento del Trabajo y Recursos Humanos recalcó que “el propósito de este proyecto es liberar de deducciones toda aquella compensación o regalía que el patrono haga a sus empleados cuando cierre su negocio, sufra *638 cambios tecnológicos o una reorganización”.(92) Por eso es que la ley faculta al patrono y al empleado para acordar los descuentos, si algunos, que deseen imponerle a la indemnización por cesantía o años de servicios.(93)
También, se beneficia de esta legislación, el pago que un patrono le otorga a un empleado mediante un acuerdo de transacción, a cambio de que el trabajador le devuelva su empleo y lo releve de una reclamación judicial mediante la Ley Núm. 80 de 1976.(94) Es imperativo recordar que, según la Ley Núm. 80 de 1976, todo despido se presume injustificado hasta que el patrono demuestre lo contrario.(95) El principio rector de que el despido fue injustificado o ilegal es el fundamento para que esta modalidad de compensación, al igual que la "mesada” pagada como resultado de un juicio contencioso, esté exenta de los descuentos de nóminas.
Hemos visto que ni la "mesada” concedida judicial o ex-trajudicialmente, mediante un acuerdo de transacción en *639 el cual se releva al patrono de una potencial reclamación según la Ley Núm. 80, supra, ni el severance pay, constituyen un salario, logrando así rebasar la primera parte del análisis que debe utilizarse para determinar si el obrero tributa por estos conceptos. Ahora debemos precisar si este tipo de indemnización constituye “ganancia, beneficio e ingreso derivado de cualquier procedencia”, sobre el cual el empleado tenga que tributar. Si, en efecto, se trata de aigima de estas formas de ingreso bruto, será necesario determinar si hay una exención o exclusión contributiva que exonere totalmente al empleado de tributar sobre esta partida. Veamos.
Sin duda, cualquier tipo de indemnización por despido representa un beneficio para el trabajador. Sobre esta partida, el Poder Legislativo tendría la potestad constitucional para imponer tributos. Sin embargo, para aliviar el impacto social del gravamen tributario, la Rama Legislativa ha elaborado una variedad de exclusiones en beneficio del contribuyente. Una de esas exclusiones del ingreso bruto son las compensaciones que las personas reciben por lesiones o enfermedad. Sobre el particular, y al momento de los hechos de este caso, el Código tributario disponía como sigue:
(5) Compensación por lesiones o enfermedad—Excepto en el caso de cantidades atribuibles a, pero no en exceso de, las deducciones concedidas bajo la sec. 8423(aa)(2)(p) de este título en cualquier año contributivo anterior, las cantidades recibidas por razón de seguros contra enfermedad o accidente o bajo leyes de compensaciones a obreros, como compensación por lesiones personales o por enfermedad, más el monto de cualquier indemnización recibida, en procedimiento judicial o en transacción extrajudicial, por razón de dichas lesiones o enfermedad, y en cantidades recibidas como pensión, anualidad o concesión análoga por lesiones personales o enfermedad, y por razón de incapacidad ocupacional y no ocupacional, incluyendo las que resulten del servicio activo en las fuerzas *640 armadas de cualquier país. (Énfasis suplido.) 13 L.P.R.A. sec. 1822(b)(5).(96)
Interpretando esta sección, en un caso sobre si era privativa o ganancial la compensación que recibía un cónyuge por daños y perjuicios a su persona, resolvimos que las sumas recibidas como indemnización por daños nó son ganancias y, por lo tanto, no están sujetas a la contribución sobre ingresos.(97) Trece años después reiteramos esta determinación. En esa ocasión, analizando si el lucro cesante producto de una lesión o enfermedad estaba exento del ingreso bruto, determinamos que la indemnización por lucro cesante se concede para sustituir los ingresos provenientes del trabajo y, como tal, es tributable. Mientras, la *641 indemnización que se recibe por una lesión o enfermedad persigue resarcir o restaurar el daño personal sufrido y por eso está excluida del pago de la contribución sobre ingresos.(98)
La Asamblea Legislativa delegó en el Departamento de Hacienda la responsabilidad de implementar, administrar e interpretar las leyes contributivas de Puerto Rico. Cumpliendo esta encomienda, el Secretario de Hacienda interpretó la Sección 1022(b)(5) del Código de Rentas Internas de 1994, supra, previamente transcrita, relacionada con la “indemnización recibida en procedimiento judicial o en transacción extrajudicial como compensación por lesiones personales o enfermedad”, para establecer que la única forma en que se puede aplicar esta exclusión del ingreso bruto es si el contribuyente logra demostrar que:
1. La causa de acción que da paso a la indemnización está basada en una causa de acción de derechos torticeros (daños y perjuicios) o de tipo torticero; y
2. Que la indemnización se recibió por razón de lesiones personales o de enfermedad.(99)
Según el Secretario de Hacienda la causa de acción se fundamenta en derechos torticeros si el pago recibido se satisface para indemnizar lesiones personales, tales como “el dolor, el sufrimiento, las angustias mentales, los daños a la reputación”,(100) entre otros. En este grupo excluido del ingreso bruto, el Secretario de Hacienda no incluye la indemnización por despidos injustificados recibidos según la Ley Núm. 80 de 30 de mayo de 1976, según enmendada.(101)
Como norma general, los tribunales deben sopesar la interpretación que hace una agencia sobre el significado y la aplicación de sus estatutos, desde una perspec *642 tiva de gran deferencia. De esa forma reconocemos el conocimiento especializado de las agencias y de que son ellas las llamadas a ejercer los poderes delegados por la Legislatura.(102) No obstante, esta deferencia judicial al conocimiento o expertise administrativo cederá ante una actuación irrazonable, ilegal o constitutiva de resultados contrarios al propósito y a la política pública del estatuto.(103) Resolvemos que la interpretación del Departamento de Hacienda sobre la Sección 1022(b)(5) del Código de Rentas Internas de 1994, supra, es contraria no tan sólo a la legislación contributiva y laboral del país, sino a nuestra jurisprudencia, que ha establecido que la compensación por despido injustificado no constituye el pago de un salario adeudado, sino una indemnización del daño ocasionado por el despido.
La interpretación del Departamento de Hacienda de los “derechos torticeros” o “daños y peijuicios” es injustificadamente restrictiva. Es totalmente contraria a la de especialistas destacados en materia contributiva, como el licenciado Meléndez Carrucini, quien concluye que, por ser de naturaleza torticera, las compensaciones obtenidas al amparo de la Ley Núm. 80 de 1976, supra, no deben considerarse ingreso para propósitos tributarios.(104) El licenciado Meléndez Carrucini sustenta su posición en el carácter reparador del estatuto y en que “la acción bajo dicha ley sería para reclamar unas indemnizaciones por un acto injustificado de un patrono que despide sin justa causa al empleado, y no para cobrar unos sueldos que no habían sido *643 pagados”.(105) Además, Meléndez Carmcini señala que las enmiendas a la Ley Núm. 80 de 1976 y a la Ley de Contribución sobre Ingresos de 1954, ambas discutidas previamente, validan su interpretación en la medida como establecieron que la indemnización por despido injustificado no estaría sujeta a ningún descuento de nómina. Concluye que éstas son reflejo de la intención legislativa de no considerar como ingreso esta compensación.(106)
Hemos definido el concepto daño como “todo aquel menoscabo material o moral que sufre una persona ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra”.(107) Esta concepción amplia del daño aplica al despido, porque éste tiene efectos adversos en la vida del trabajador.
Como expresa la Guía Revisada del Departamento del Trabajo, supra, el rompimiento de la relación laboral en muchos casos “conlleva para el trabajador y sus dependientes la pérdida de su único medio de sustento económico y, por lo tanto, la incapacidad para poderse suplir los artículos y servicios que resultan indispensables para su diario vivir”.(108) Se ha documentado que algunos de los efectos morales más comunes que provoca esta situación son: “la ansiedad; el fuerte daño a la autoestima; los sentimientos de culpa; el deterioro del autoconcepto; la depresión y el abando no.”(109) Además, los estudios sugieren que el des *644 pido en personas con una carrera de trabajo ya avanzada, conlleva no sólo el menoscabo económico, sino que ocasiona otras consecuencias sustanciales a la salud.(110)
Ante esta realidad, es ineludible concluir que las *645 indemnizaciones por despido, producto de una reclamación judicial o de una transacción extrajudicial, son exentas de la contribución sobre ingresos, puesto que cualifican para la exclusión contributiva que posibilita el que las indemnizaciones, cuya finalidad sea reparar una lesión personal o enfermedad, estén exentas de tributación. Este análisis no es necesario aplicarlo a las indemnizaciones por cesantía o por años de servicios (severance payments), porque ya la Asamblea Legislativa estableció de forma expresa que este tipo de compensación especial está exenta del pago de las contribuciones sobre ingresos.(111)
III
El Departamento de Hacienda recurrió ante este tribunal planteando, en esencia, que la compensación por despido que Pfizer, Inc. le otorgó al señor Orsini García era tributable. Argumentó su posición en que este pago no tenía la finalidad de resarcir un daño físico y emocional o por lesiones personales o enfermedad, que es el único tipo de compensación que está exenta de tributación. Esto, según Hacienda, en consonancia con la norma restrictiva que permea las exclusiones del ingreso bruto.
Planteó, además, que el pago se había recibido en concepto de severance payment y que, como tal, para la fecha de los hechos, era tributable; que el pago no se había concedido en concepto de “mesada” para resarcir un daño por despido injustificado y que, de ser así, también sería tributable. Esto fundamentado en que la interpretación de la legislación contributiva le correspondía al Departamento de Hacienda y que dichas interpretaciones merecen una gran deferencia. Por su parte, el planteamiento del señor Orsini García se basa en que la indemnización por un despido injustificado no es tributable, porque su finali *646 dad es resarcir el daño ocasionado por la pérdida del empleo.
Es cierto que la concepción del término “ingreso bruto” es amplia y abarcadora. También es correcto que sólo son excluidas del ingreso bruto aquellas partidas que estén ex-presamente dispuestas en la ley de contribución sobre ingreso. No obstante, esto no es contradictorio con el principio que establece que las leyes que imponen contribuciones deben ser interpretadas de forma razonable, es decir, coherentes con el objetivo que persigue el legislador.
Es a esos efectos que hemos elaborado el análisis jurídico explicado, que sirve para determinar si las indemnizaciones por despido que el patrono concede mediante un contrato de transacción son tributables. Este análisis consiste en establecer, primero, si esta indemnización constituye un salario o puede clasificarse como una ganancia, un beneficio o ingreso derivada de cualquier procedencia. De ser ello así, se debe examinar si el obrero que recibe la indemnización puede beneficiarse de una de las exclusiones o exenciones contributivas y, por esa razón, no tiene que tributar por la indemnización recibida.
En numerosas ocasiones hemos reiterado que las indemnizaciones por un despido injustificado no se consideran salarios, porque su finalidad no es compensar un trabajo realizado, sino resarcir el daño que provoca el despido. Tal apreciación fue validada en la Ley de Contribuciones sobre Ingresos de 1994, cuando se eximió de los descuentos de nóminas a este tipo de compensación. Esta consideración no aplica tan solo a la indemnización que se otorga cuando se determina judicialmente que el despido fue injustificado. También aplica a la compensación que recibe el obrero a través de un contrato de transacción según la Ley Núm. 80 de 1976, como sucedió en este caso. La razón para esto es que la presunción de que todo despido se considera injustificado, salvo que el patrono demuestre lo *647 contrario, no se elimina por el mero hecho de haberse concedido la “mesada” mediante un contrato de transacción.
Sin embargo, aunque no se trate de salario, debemos examinar si este tipo de pago constituye ingreso bruto producto de ganancia, beneficio o ingreso derivado de cualquier procedencia. Como vimos, en efecto, este tipo de indemnización resulta ser un beneficio para el obrero que se queda sin empleo y, por lo tanto, constituye ingreso bruto, según lo define la Sección 1022 del Código de Rentas Internas de 1994, supra. No obstante, según vimos, toda indemnización recibida en un procedimiento judicial o en transacción extrajudicial, por razón de lesiones personales o enfermedad, queda excluida de tributación.
Los abarcadores y numerosos estudios a los que hemos hecho referencia demuestran que el despido es un daño que repercute de forma integral en el aspecto moral y físico del obrero que se queda sin el medio para sustentar su vida y la de su familia. Por eso, no se pueden deslindar los efectos morales y físicos del despido, más bien, ambos están presentes como consecuencia el uno del otro. Por lo tanto, en función de la norma de exclusión adoptada por el Departamento de Hacienda, la indemnización que se obtiene como resultado del despido se excluye del ingreso bruto tributable.(112)
La indemnización por despido tiene la finalidad de asegurar que las personas que se quedan sin trabajo puedan sostenerse económicamente, complementando este apoyo económico con otros beneficios sociales otorgados a los obreros y sus familias. El dinero de “mesada” nunca será suficiente para equiparar los ingresos derivados del trabajo perdido y la seguridad social y estabilidad laboral que éste representaba. Entonces, sería incompatible e in *648 justo imponerle al obrero la obligación de tributar sobre esa partida cuando ésta es insuficiente para todos los propósitos de sobrevivencia. En lugar de beneficiar al obrero, esta actuación tendría el efecto de penalizarlo, porque como no se efectúa la retención en el origen de dicha partida, la tasa contributiva aumentará en clara contradicción a la finalidad remediativa de la citada Ley Núm. 80 de 1976.
IV
Por los fundamentos expresados, concluimos que la indemnización recibida por el señor Orsini García en este caso, por contrato de transacción mediante la Ley Núm. 80, supra, suscrito con su patrono, no es tributable. Resolvemos que no es tributable la indemnización por despido, que se activa como resultado de una responsabilidad patronal, sea contractual o legal, porque la finalidad de esta indemnización es reparar el daño ocasionado al obrero por la pérdida de su empleo. Por consiguiente, se dictará sentencia para confirmar la sentencia del Tribunal de Apelaciones.
La Juez Asociada Señora Rodríguez Rodríguez concurrió sin opinión escrita. El Juez Asociado Señor Martínez Torres y la Jueza Asociada Señora Pabón Charneco concurrieron con una opinión escrita.

 Véase Notificación Final de la Deficiencia, Apéndice de la Apelación, pág. 82.

 L. Recasens Siches, Introducción al Estudio del Derecho, 3ra ed., México, Ed. Porrúa, 1974, pág. 213; B. de Castro Cid, La filosofía jurídica de Luis Recasens Siches, Salamanca, Ed. Universidad de Salamanca, 1974, págs. 217-218.

 Pueblo v. Negrón Caldero, 157 D.P.R. 413, 423 (2002); Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 275 (2000), citando a Pueblo v. Tribunal Superior, 104 D.P.R. 363, 366 (1975).

 L. Recaséns Siches, Nueva filosofía de la interpretación del Derecho, 2da ed., México, Ed. Porrúa, 1973, págs. 131-187. Véase, además, De Castro Cid, op. cit., pág. 248, citando a Recaséns Siches.

 De Castro Cid, op. cit, pág. 249. Véase, además, Recaséns Siches, op. cit., pág. 40.

 R.E. Bemier y J.A. Cuevas Segarra, Aprobación e interpretación de leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, págs. 242-243 y 369-386.

 P. Piore, De la irretroactividad e interpretación de las leyes: estudio crítico y de legislación comparada, 3ra ed., Madrid, Ed. Reus, 1927, pág. 578.

 Álvarez & Pascual, Inc. v. Srio. de Hacienda, 84 D.P.R. 482, 491 (1962), fundamentándose en las fuentes siguientes: Roschen v. Ward, 279 U.S. 337, 339 (1929); F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Columbia L.Rev. 527 (1947).

 Encamación v. Jordán, 78 D.P.R. 505, 519 (1955). Al utilizar estos elementos extrínsecos, se persigue otorgar al estatuto un contenido no tan solo literal, sino también lógico a la voluntad legislativa. A este tipo de operación de hermeneútica se le denomina “construcción o interpretación extensiva”. Sobre este método de interpretación, los tratadistas Bernier y Cuevas Segarra op. cit., pág. 263, explican lo siguiente: “En la construcción extensiva se usa el procedimiento de comparar las cosas previstas por la ley con otras no comprendidas en su letra, pero que resultaría absurdo no incluir en ella. También el de proyectar la interpretación a otras situaciones de razón mayor o de más fuerza, en que los motivos que haya tenido el legislador para aprobar determinada legislación serían más evidentes que en los casos que el legislador previo expresamente en la ley.”

 Acevedo Vilá v. C.E.E., 172 D.P.R. 971 (2007); Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 163 (2000); Piñero v. A.A.A., 146 D.P.R. 890, 898 (1998); Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998); Col. Ópticos P.R. v. Pearl Vision Center, 142 D.P.R. 221, 228 (1997); J.R.T. v. A.E.E., 133 D.P.R. 1, 9 (1993); Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992); Vázquez v. A.R.Pe., 128 D.P.R. 513, 523 (1991); García Pagán v. Shiley Caribbean, etc., 122 D.P.R. 193, 208 (1988).

 Matos v. Junta Examinadora, 165 D.P.R. 741, 748 (2005); Piñero v. A.A.A., supra; Col. Ópticos P.R. v. Pearl Vision Center, supra; Col. Ing. Agrim. P.R. v. A A.A., 131 D.P.R. 735, 756 (1992); Vázquez v. A.R.Pe., supra; García Pagán v. Shiley Caribbean, etc., supra.

 Rodríguez v. Syntex, 160 D.P.R. 364, 383 (2003); P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 285 (2000); Zambrana Maldonado v. E.L.A., supra; Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988).

 Citado en Recaséns Siches,, op. cit., pág. 41. Véase, también, E. Pedro Haba, El espejismo de la interpretación literal: encrucijadas del lenguaje jurídico, San José, Ed. Vlamarán, 2003, T. I, págs. 69-70.

 San Juan Trading Co. v. Srio. de Hacienda, 80 D.P.R. 807, 816 (1968); Flax v. Tesorero, 76 D.P.R. 390, 396 (1954).

 Adventist Health v. Mercado, 171 D.P.R. 255 (2007); Cintrón v. Ritz Carlton, 162 D.P.R. 32, 39 (2004).

 Arce y otros v. Motorola, 173 D.P.R. 516 (2008); Adventist Health v. Mercado, supra; Torres Santiago v. Mun. de Coamo, 170 D.P.R. 541 (2007); Muñoz Hernández v. Policía de P.R., 134 D.P.R. 486, 496-497 (1993); Martínez Reyes v. Tribunal Superior, 104 D.P.R. 407, 411 (1975). Véanse, además: Bemier y otros, op. cit., pág. 455; C. Zeno Santiago y V.M. Bermúdez, Tratado del Derecho del Trabajo, San Juan, Pubs. JTS, 2003, T. I, págs. 27 y 94; R.N. Delgado Zayas, Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño, San Juan, [s. Ed.], 2005, pág. 15.

 Arce y otros v. Motorola, supra; Adventist Health v. Mercado, supra; Torres Santiago v. Mun. de Coamo, supra; García Burgos v. A.E.E.L.A., 170 D.P.R. 315 (2007); Jiménez, Hernández v. General Inst., Inc., 170 D.P.R. 14 (2007); Piñero v. A.A.A., supra, págs. 901-902.

 PARDAVCO, Inc. v. Srio. de Hacienda, 104 D.P.R. 65, 73 (1975); Publio Díaz v. E.L.A., 106 D.P.R. 854, 870 (1978); Central Aguirre Sugar v. Srio. Hacienda, 91 D.P.R. 340, 347 (1964).

 G. Meléndez Carrucini, Ingreso No Tributable: Exclusiones y Doctrinas, San Juan, Instituto de Contribuciones de Puerto Rico, 1994, págs. 57-58.

 Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559-560 (2001); Lever Bros. Export Corp. v. Alcalde S.J., 140 D.P.R. 152, 161-162 (1996); Berwind Lines, Inc. v. Srio. de Hacienda, 113 D.P.R. 658, 660 (1982).

 San Juan Trading Co. v. Srio. de Hacienda, supra, pág. 815; Rivera v. Registrador, 74 D.P.R. 127, 143 (1952); Sucn. Pedro Giusti v. Tribunal de Contribuciones, 70 D.P.R. 117, 121 (1949).

 Roque González & Co. v. Srio. de Hacienda, 127 D.P.R. 842, 856-857 (1991); Industria Lechera v. Srio. de Hacienda, 95 D.P.R. 839, 842 (1968); Licorería Trigo, Inc. v. Srio. de Hacienda, 94 D.P.R. 270, 279 (1967).

 Meléndez Carrucini, op. cit., pág. 23.

 íd., op. cit., pág. 73.

 B.B.C. Realty v. Secretario Hacienda, 166 D.P.R. 498, 508 (2005); Café Rico, Inc. v. Mun. de Mayagüez, supra, pág. 559; Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146, 157-158 (2001); Talcott Inter-Amer. Corp. v. Registrador, 104 D.P.R. 254, 262 (1975).

 B.B.C. Realty Inc., v. Secretario Hacienda, supra, pág. 507; Central Aguirre Sugar v. Srio. Hacienda, supra, pág. 348; Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953).

 G. Caballerías de Torres, Diccionario de Derecho Laboral, Buenos Aires, Ed. Heliasta 2001, págs. 139-140. Véase, además, Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 517 (1998).

 Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 166 esc. 9 (1994); Santiago v. Kodak Caribbean, Ltd., 129 D.P.R. 763, 776 (1992).

 Véase Delgado Zayas, op. cit., pág. 4.

 C. Reynoso Castillo, El despido individual en América Latina, México D. F., Universidad Nacional Autónoma de México, 1990, págs. 92-94.

 Reynoso Castillo, op. cit., pág. 95; V.H. Álvarez Chávez, Regímenes Indemnizatorios del Despido: Teoría y Práctica, Buenos Aires, Ed. Abaco, 1988, pág. 36.

 Algunas de estas leyes son: Ley Núm. 100 de 30 de junio de 1959, según enmendada, Ley contra el Discrimen en el Empleo, 1959 Leyes de Puerto Rico 300; Ley Núm. 17 de 22 de abril de 1988, Ley para Prohibir el Hostigamiento Sexual en el Empleo, 1988 Leyes de Puerto Rico 80; Ley Núm. 3 de 13 de marzo de 1942, según enmendada, Ley de Discrimen contra la Mujer Embarazada, 1942 Leyes de Puerto Rico 285; Ley Núm. 115 de 20 de diciembre de 1991, Ley de Represalias en el Empleo, 1991 (Parte 1) Leyes de Puerto Rico 956; entre otras. Para un mayor desglose de este tipo de leyes, véase Delgado Zayas, op. cit., págs. 112-114.

 Delgado Zayas, op. cit., pág. 110; Art. 220 del Código de Comercio de Puerto Rico de 1 de mayo de 1886, Compilación de los Estatutos Revisados y Códigos de Puerto Rico, San Juan, Negociado de Materiales, Imprenta y Transporte, 194Í, pág. 916. Véase, además, Departamento del Trabajo y Recursos Humanos, Guía revisada para la interpretación y aplicación de la Ley Núm. 80, aprobada el 30 de mayo de 1976, según enmendada, 2000, págs. 2-3.

 Enmendada por la Ley Núm. 84 de 12 de mayo de 1943, a los efectos de “establecer el derecho del trabajador contratado sin término fijo que fuere despedido sin justa causa a recibir de su patrono una suma correspondiente a un mes de sueldo, en lugar de una suma que se hacía depender de los términos de pago al trabajador, como lo disponía anteriormente la Ley Núm. 43”. Departamento del Trabajo y Recursos Humanos, supra, pág. 4.

 Long Corporation v. Trbl. de Distrito, 72 D.P.R. 788 (1951).

 Ley Núm. 50 de 20 de abril de 1949, Artículo 1, Leyes de la Primera Legislatura Ordinaria de la Decimoséptima Asamblea Legislativa de Puerto Rico, San Juan, Administración General de Suministros, 1949, pág. 127. Véanse, además: L. Sánchez Caso, Reflexiones sobre la responsabilidad civil de los oficiales y gerenciales en reclamaciones de despido o discrimen, 39 (Núm. 1) Rev. Jur. U.I.P.R. 239, 245 (2004); Departamento del Trabajo y Recursos Humanos, supra, pág. 4. Otra contribución de este estatuto fue eliminar el requisito del preaviso y uniformar la compensación a un mes de sueldo.

 La Ley Núm. 80 ha sido enmendada, además, por los siguientes estatutos: la Ley Núm. 128 de 7 de octubre de 2005; la Ley Núm. 306 de 23 de diciembre de 1998; la Ley Núm. 234 de 17 de septiembre de 1996; la Ley Núm. 45 de 6 de agosto de 1991, la Ley Núm. 115 de 20 de diciembre de 1991; la Ley Núm. 7 de 1 de marzo de 1988; la Ley Núm. 9 del 3 de octubre de 1986; la Ley Núm. 65 de 3 de julio de 1986; la Ley Núm. 146 de 18 de julio de 1986; la Ley Núm. 67 de 3 de julio de 1986 y la Ley Núm. 16 de 21 de mayo de 1982. 29 L.P.R.A. secs. 185a eí seq.

 Art. 1 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185a; García v. Aljoma, 162 D.P.R. 572, 585 (2004); Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 375 (2001).

 Santiago v. Kodak Caribbean, Ltd., supra, pág. 775; Delgado Zayas, op. cit., pág. 115. Véase, además, Luis H. Sánchez Caso, “Reflexiones sobre la Responsabilidad Civil de los Oficiales y Gerenciales en Reclamaciones de Despido o Discrimen”, 34(Núm. 2) Rev. Jur. U.I.P.R. 183, 210-211 (1999-2000).

 Díaz v. Wyndham Hotel Corp., supra, pág. 374. Véanse: Delgado Zayas, op. cit., págs. 127-128; C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. J.T.S., 2003, T. I, pág. 35.

 Exposición de Motivos de la Ley Núm. 80, según enmendada, 1976 Leyes de Puerto Rico 268.

 Art. 2 de la Ley Núm. 80 (29 L.P.R.A. sec. 185b); Srio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R. 223, 242 (2001). Jusino et als. v. Walgreens, 155 D.P.R. 560, 573 (2001); Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 650 (1994).

 Art. 1(b), supra; 29 L.P.R.A. sec. 185(a)(b).

 29 L.P.R.A. 185a (Supl. 2002).

 Historial Legislativo, P. de la C. 631, Ley Núm. 128 de 7 de octubre de 2005, 29 L.P.R.A. sec. 185a (Supl. 2008). Esta enmienda no aplica a nuestra controversia, porque los hechos de este caso sucedieron durante el 2003.

 Arthur Young & Co. v. Vega III, supra, pág. 189. En cuanto a esto, los profesores Zeno Santiago y Bermúdez plantean que es a través del trabajo que “el ser humano se inserta de manera productiva en la comunidad y a la vez que desarrolla sus habilidades, pone al servicio de los demás su creatividad, lo que le permite gozar de un sentimiento de valía que es la esencia de la dignidad humana”. Zeno Santiago y Bermúdez, op. cit., pág. 1.

 Belk v. Martínez, 146 D.P.R. 215, 232 (1998); Beauchamp v. Holsum Bakers of P.R., 116 D.P.R. 522, 526 (1985).

 “Acuerdo de Relevo”, Apéndice de la Apelación, pág. 133.

 Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821. Véanse, además: López Tristani v. Maldonado, 168 D.P.R. 838 (2006); Rivera Rodríguez v. Rivera Reyes, 168 D.P.R. 193 (2006); Igaravidez v. Ricci, 147 D.P.R. 1, 5 (1998).

 S. Tamayo Haya, El Contrato de Transacción, Madrid, Ed. Thomson/Civitas, 2003, pág. 26.

 Monteagudo Pérez v. E.L.A., 172 D.P.R. 12 (2007); Igaravidez v. Ricci, supra, págs.5; Ñeca Mortg. Corp. v. A & W Dev. S.E., 137 D.P.R. 860, 870-871 (1995).

 J.R. Vélez Torres, Curso de Derecho Civil: Derecho de obligaciones, San Juan, Ed. U.I.A, 1990, T. IV, V. II, pág. 498.

 Mun. de San Juan v. Prof. Research, 171 D.P.R. 219 (2007); López Tristani v. Maldonado, supra; Neca Mortg. Corp. v. A. & W. Dev. S.E., pág. 870. Véase, además, L.R. Rivera Rivera, El contrato de transacción: sus efectos en situaciones de solidaridad, San Juan, Jurídica Eds., 1998, pág. 35.

 Véanse: Tamayo Haya, op. cit., págs. 55-74; Rivera Rivera, op. cit., págs. 54-60.

 Rivera Rodríguez v. Rivera Reyes, supra; Sucn. Román v. Shelga Corp., 111 D.P.R. 782, 789 (1981).

 Aj-k 1714 del Código Civil, 31 L.P.R.A. sec. 4826. Véanse, además: Monteagudo Pérez v. E.L.A., supra; Blás v. Hospital Guadalupe, 167 D.P.R. 439, 449 (2006); Crespo Cardona v. Autoridad de Carreteras, 136 D.P.R. 938 (1994); Citibank v. Dependable Ins. Co., 121 D.P.R. 503, 514 (1988); Negrón Rivera y Bonilla, Ex parte, 120 D.P.R. 61, 74-75 (1987); Sucn. Román v. Shelga Corp., supra.

 Art. 4 del Código Civil, 31 L.P.R.A. see. 4.

 Las demás leyes locales son: (1) Ley Núm. 69 de 6 de julio de 1985, Discrimen en el Empleo por Razón de Sexo, 1985 Leyes de Puerto Rico 252; (2) Ley Núm. 115 de 20 de diciembre de 1991, Ley de Represalias en el Empleo, supra; (3) Ley Núm. 100 de 30 de junio de 1959, según enmendada, Ley contra el Discrimen en el Empleo, supra: (4) Ley Núm. 17 de 22 de abril de 1988, Ley para Prohibir el Hostigamiento Sexual en el Empleo, supra; (5) Ley Núm. 44 de 2 de julio de 1985, según enmendada, Ley de Prohibición de Discrimen contra Impedidos, 1985 Leyes de Puerto Rico 166; (6) Art. 1802 del Código Civil, supra. En cuanto a las leyes laborales federales, se eximió a la compañía Pfizer, Inc. de responsabilidad según: (1) Ley de Derechos Civiles de 1866; (2) Ley de Derechos Civiles de 1964; (3) Ley de Derechos Civiles de 1991; (4) Ley de Discrimen por Edad en el Empleo de 1967 (ADEA); (5) Ley de Americanos con Impedimentos de 1990(ADA); (6) Ley de Igual Paga por Igual Trabajo; (7) Ley de Protección de Beneficios de Trabajadores de Edad Avanzada de 1990 (OWBPA); (8) Ley de Notificación de Ajuste y Recapacitación de Trabajadores (WARN); (9) Licencia Médico Familiar (FMLA); (10) Ley de Seguridad de Ingreso de Retiro del Empleado (ERISA).

 No obstante, cabe recordar que las leyes protectoras del trabajo tienen como propósito poner en vigor las disposiciones constitucionales del aspecto sustantivo del derecho laboral. Art. II, Sec. 1, 16, Const. E.L.A., L.P.R.A., Tomo 1; Véase, además, Delgado Zayas, op. cit., págs. 3 y 6-7. Por eso hemos resuelto, según señala Delgado Zayas, que “gran parte de las condiciones de trabajo establecidas en Puerto Rico en virtud de nuestra Legislación Protectora del Trabajo es de carácter irrenunciable”. Delgado Zayas, op. cit. Véanse, además: Benítez et als. v. J & J, 158 D.P.R. 170, 174-177 (2002); Soc. de Gananciales v. Vélez & Assoc., supra, pág. 518; Nazario v. Tribunal Superior, 98 D.P.R. 846, 853 (1970). Véanse, también, las disposiciones de la Ley Núm. 379 de 15 de mayo de 1948, según enmendada por la Ley Núm. 180 de 27 de julio de 1998, que requieren la intervención del Secretario del Trabajo y Recursos Humanos, abogado o un mediador de dicha agencia, en cualquier transacción sobre condiciones de trabajo protegidas por la ley. Art. 14 de la Ley Núm. 379 de 15 de mayo de 1948, según enmendada, 29 L.P.R.A. see. 282 y el Art. 4-7 del Reglamento del Secretario del Trabajo y Recursos Humanos de Puerto Rico para Establecer las Normas a Seguir en la Aprobación de Transacciones de las Reclamaciones Instadas al Amparo de la Ley [Núm.] 96 de 26 de junio de 1956, según enmendada, y de la Ley Núm. 379 de 15 de mayo de 1948, según enmendada, Reglamento Núm. 3060 del Departamento de Estado, 7 de diciembre de 1983.

 29 L.P.R.A. sec. 185i. Véase, además, García v. A.E.E.L.A., supra; Soc. de Gananciales v. Vélez & Assoc., supra, pág. 518.

 Mengod Gimeno, Indemnización por años de servicios, Santiago, Ed. Jurídica de Chile, 1966, págs. 10-11.

 Mengod Gimeno, op. cit., pág. 6.

 Personnel Policies Forum, Severance Benefits and Outplacements Services, The Bureau of National Affairs, Inc., Washington, D.C., No. 143, December 1986, pág. 3. Véase, además, Personal Policies Forum, Separation Procedures & Severance Benefits, The Bureau of National Affairs, Inc., Washington, D.C., No. 121, April 1978.

 Albino v. Ángel Martínez, Inc., 171 D.P.R. 457 (2007); Vázquez Cintrón v. Banco Desarrollo, 171 D.P.R. 1 (2007); Selosse v. Fund. Educativa Ana G. Méndez, 122 D.P.R. 534, 548-549 (1988); Santiago v. Kodak Caribbean, Ltd., supra, págs. 775-776.

 Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 420.

 Mun. de San Juan v. Prof. Research, supra; Burlington Air Exp., Inc. v. Mun. de Carolina, 154 D.P.R. 558, 597 (2001); R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, 428 (1964).

 G. Meléndez Carrucini, Ingreso Tributable: Inclusiones y Doctrinas, San Juan, Instituto de Contribuciones de Puerto Rico, Inc., 1991, pág. 12.

 Esta ley fue enmendada por la Ley Núm. 117 de 4 de julio de 2006 conocida como Ley de la Justicia Contributiva de 2006 (13 L.P.R.A. see. 8411 et seq.).

 Exposición de Motivos, Código de Rentas Internas de 1994 (1994 (Parte 1) Leyes de Puerto Rico 565-569), 13 L.P.R.A. see. 8007.

 M. Tirado Viera, Fundamentos de las contribuciones sobre ingresos de Puerto Rico, 2da ed., [s. Ed.] 1986, pág. 1.

 Sec. 1022(a) del Código de Rentas Internas, 13 L.P.R.A. sec. 8422(a).

 Meléndez Carrucini, Ingreso Tributable, op. cit., pág. 150.

 Id, pág. 152.

 Tirado Viera, op. cit., pág. 27 esc. 5.

 Flax v. Tesorero, supra, pág. 393. Véase, además, Meléndez Carrucini, Ingreso Tributable, op. cit, pág. 246.

 Sec. 1022 del Código de Seguros, 13 L.P.R.A. sec. 8422.

 Reglamento para Implantar las Disposiciones de la Sección 1141 de la Ley Núm. 120 de 31 de octubre de 1994, según enmendada, conocida como Código de Rentas Internas de Puerto Rico de 1994, Departamento de Hacienda, 22 de diciembre de 2000, pág. 1.

 R. Moreno Rodríguez, Diccionarios de Ciencias Sociales, Buenos Aires, Ed. Dicciobibliografía, 2003, T. 1, pág. 351. Véase, además, I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed., San Juan, Ed. Lexis Nexis, 2000, págs. 54-55, donde se define el concepto “contribución” de la forma siguiente:
“Tributo que recae sobre los rendimientos de un bien o que grava la obtención de un beneficio para el contribuyente o el aumento del valor de un bien como consecuencia de una actuación administrativa.”

 Diccionario de economía y negocios, Madrid, Ed. Espasa Calpe, 2002, pág. 123.

 Tirado Viera, op. cit, pág. 394.

 Anteriormente, esta cita se encontraba en 13 L.P.R.A. sec. 1341(a)(1). No obstante, para la fecha de esta controversia es la See. 1141 (13 L.P.R.A. see. 8541(a)(1)).

 Antes la cita se encontraba en 13 L.P.R.A. sec. 1341(a)(1)(h), pero para la fecha del litigio es Sección 1141, supra, 13 L.P.R.A. sec. 8541(a)(1)(G); Departamento de Hacienda, supra, págs., 16-17.

 13 L.P.R.A. sec. 3141(a)(1)(h).

 Actualmente, se encuentra en el Artículo 10 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185j.

 Historial Legislativo, Informe de la Comisión del Trabajo y Asuntos del Veterano, P. de la C. 320, 9no Asamblea Legislativa, 2da sesión Ordinaria, 21 de abril de 1982.

 Alvira v. SK & F Laboratories Co., 142 D.P.R. 803, 812-813 (1997). Véase, además, Municipio de Coamo v. Tribunal Superior, 99 D.P.R. 932, 940 (1971), donde también expresamos que el remedio sobre los despidos ilegales no constituye una remuneración por servicios prestados y sí una indemnización en dinero tradicionalmente concedida en estos casos, siendo el sueldo sólo la base para computarlo.

 Guía Revisada para la aplicación de la Ley Núm. 80, Departamento del Trabajo y Recursos Humanos, 21 de septiembre de 2000, pág. 43.

 Art. 1 de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, supra. Como mencionamos previamente, este artículo fue enmendado por la Ley Núm. 128 de 7 de octubre de 2005, a los efectos de aumentar los beneficios del remedio exclusivo.

 A. Acevedo Colom, Legislación Protectora del Trabajo, 8va ed., San Juan, [s. Ed.], 2005, pág. 174.

 La Ley Núm. 278 de 15 de agosto de 2008 enmendó los Artículos 7 y 10 de la Ley Núm. 80 de 30 de mayo de 1976, supra. El primer intento para probar este tipo de legislación fue en 2005, P. del S. 210. Véase, además, Comisión de Gobierno y Asuntos Laborales, y la de Hacienda, Informe conjunto positivo sobre el P. del S. 210, 28 de noviembre de 2005. El expediente del P. del S. 210 se adoptó para evaluar el P. del S. 2455, que eventualmente se convirtió en la ley citada, porque atendía el mismo asunto.

 29 L.P.R.A. sec. 185b.

 Comisión del Trabajo y Asuntos Laborales, Informe Negativo de la Cámara de Representantes sobre el P. del S. 2455,18 de junio de 2008; Comisión de Hacienda y Asuntos Financieros, Informe Negativo de la Cámara de Representantes sobre el P. del S. 210, 10 de abril de 2008.

 Art. 2 de la Ley Núm. 278 de 15 de agosto de 2008 (29 L.P.R.A. sec. 185j).

 Limitamos el análisis contributivo a un típico contrato de transacción mediante la Ley Núm. 80 de 1976, supra, porque no están ante nuestra consideración otros aspectos del contrato entre Pfizer, Inc, y el señor Orsini García.

 Artículo 8 de la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185k); Delgado Zayas v. Hosp. Int. Med. Avanzada, supra, pág. 650; Rivera Águila v. K-mart de P.R., 123 D.P.R. 599, 610 (1989); Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 546-547 (1979). Para rebatir esta presunción, el patrono debe presentar, en un proceso judicial, aquella prueba que establezca que hubo justa causa para el despido. Díaz v. Wyndham Hotel Corp., supra, pág. 378; Delgado Zayas v. Hosp. Int. Med. Avanzada, supra. Es decir, el peso de la prueba para establecer que el despido fue justificado recae en el patrono y el criterio, como en cualquier proceso civil, es el de preponderancia de la prueba. Díaz v. Wyndham Hotel Corp., supra; Belk v. Martínez, supra, pág. 231; Srio. del Trabajo v. I.T.T., supra, págs. 546-547. Corresponde a los tribunales “determinar, después de considerar los hechos y circunstancias especiales de cada caso, si el despido de un obrero estuvo justificado o si fue caprichoso”. Mercado v. Hull Dobbs Corp., 90 D.P.R. 864, 868 (1964). Esto implica que la presunción de que el despido es injustificado no cede a menos de que ambas partes, empleado y patrono, diluciden esta controversia ante los tribunales.

 Este precepto fue adoptado en la Sec. 22(b)(5), 13 L.P.R.A. sec. 3022(b)(5), de la Ley de Contribuciones sobre Ingresos de 1954, Ley Núm. 91 de 29 de junio de 1954, derogada, y se mantuvo en la See. 1022 de la Ley de Contribuciones sobre Ingresos de 1994, Ley Núm. 120 de 31 de octubre de 1994 (13 L.P.R.A. see. 8422(b)(5)). Al amparo de ésta el Secretario de Hacienda aprobó la Determinación Administrativa 98-01, que discutimos más adelante. Esta sección fue enmendada por la Ley de la Justicia Contributiva del 2006, Ley Núm. 117 de 4 de julio de 2006, a los efectos de excluir del ingreso bruto, en lo pertinente, aquellas indemnizaciones por “lesiones físicas personales” o por “enfermedad física” que se obtienen a través de un procedimiento judicial o de una transacción extrajudicial.
Como resultado de esta enmienda el Secretario de Hacienda aprobó una nueva determinación administrativa, para revocar la anterior, indicando que las compensaciones concedidas por los daños y perjuicios morales sufridos o las angustias y los sufrimientos mentales no están excluidos del ingreso bruto, por lo cual tendrán que pagar tributo. Determinación Administrativa Núm. 07-01, “Tratamiento Contributivo de Indemnización Recibida por Concepto de Daños y Perjuicios, por Razón de Incapacidad Ocupacional y No Ocupacional; y Pagos por Terminación de Empleo”, 12 de enero de 2007, págs. 2-3. En esta determinación se mantuvo la “mesada” como parte del ingreso bruto. Determinación Administrativa Núm. 07-01, supra, págs. 3.
Un año después, el Secretario de Hacienda enmendó la Determinación 07-01, a los efectos de aclarar que las indemnizaciones recibidas por las angustias mentales, que se originan como resultado de una lesión o enfermedad física, serán excluidas del ingreso tributable. Determinación Administrativa Núm. 08-04, “Enmienda a Determinación Administrativa Núm. 07-01 Relativa al Tratamiento Contributivo de Indemnización Recibida por Concepto de Daños y Perjuicios, por Razón de Angustias Mentales Incidentales a Daños Físicos”, 22 de mayo de 2008, págs. 2-3. En otras palabras, no se podrán excluir del ingreso bruto y serán tributables las compensaciones por los daños morales que no se originen en daños físicos.
Esta enmienda y las subsecuentes determinaciones administrativas del Departamento de Hacienda, que son posteriores a esta controversia, en forma alguna alteran nuestra determinación de que no es tributable la indemnización por despido, independientemente de la modalidad indemnizatoria que se utilice.

 Robles Ostolaza v. Ü.P.R., 96 D.P.R. 583, 595-596 (1965).

 Publio Díaz v. E.L.A., supra, pág. 869.

 Determinación Administrativa Núm. 98-01, supra, pág. 1.

 Id.

 íd., pág. 2.

 Rodríguez v. Guacoso Auto, 166 D.P.R. 433, 441 (2005); Procuradora Paciente v. MCS, 163 D.P.R. 21, 43 (2004); Pacheco v. Estancias, 160 D.P.R. 409, 433 (2003); Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 436 (1997); Vázquez v. A.R.P.E., supra, pág. 524; De Jesús v. Depto. Servicios Sociales, 123 D.P.R. 407, 418 (1989); Tormos & D.A.C.O. v. F.R. Technology, 116 D.P.R. 153, 160 (1985).

 Martínez v. Rosado, 165 D.P.R. 582, 589 (2005); Asoc. Vec. H. San Jorge v. U. Med. Corp, 150 D.P.R. 70, 75 (2000); Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 761 (1999); Com. Seg. P.R. v. Antilles Ins. Co., 145 D.P.R. 226, 233 (1998); Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020, 1042 (1992); De Jesús v. Depto. Servicios Sociales, supra.

 Meléndez Carrucini, Ingreso No Tributable, op. cit, pág. 556.

 íd., pág. 557.

 íd., pág. 558.

 López v. Porrata Doria, 169 D.P.R. 135 (2006); Lebrón v. Díaz, 165 D.P.R. 615, 620 (2005); Santini Rivera v. Serv Air, Inc., 137 D.P.R. 1, 7 (1994); García Pagán v. Shiley Caribbean, etc, supra, págs. 205-206. Véase, además, C.J. Irizarry Yunqué, Responsabilidad civil extracontractual: Un estudio basado en las decisiones del Tribunal Supremo de Puerto Rico, 6ta ed., San Juan, Ed. U.I.A., 2007, págs. 299-341.

 Qufa Revisada para la Interpretación y Aplicación de la Ley 80, supra, pág. 1.

 V.L. Hamilton y otros, Hard Times and Vulnerable People: Initial Effects of Plant Closing on Autoworkers’Mental Health, 31 J. of Health and Social Behavior 1 *644 (1990); J.E. Brand, B.R. Levy y W.T. Gallo, Effects of Layoffs and Plant Closings on Depression Among Older Workers”, California Center for Population Research, University of California, Los Angeles, pág. 4, (2007). Véase, además, W.T. Gallo y otros, The Effect of Recurrent Involuntary Job Loss on the Depressive Symptoms of Olders US Workers, 80 (Núm. 2) Int. Arch. Occup. Environ. Health 2, (Nov. 2006). “Earlier research (Gallo et. al. 2000), based on US Health and Retirement Survey (HRS) data, reported a significant association between a single involuntary job loss and increases in depressive symptoms among individuals aged 51-61 years, the decade prior to eligibility for early public retirement benefits.”

 Véase el estudio de la Escuela de Medicina y el Departamento de Epidermiología y Salud Pública de la Universidad de Yale, New Haven, Conneticut. El grupo estaba compuesto por los doctores W.T. Gallo, H.M. Teng, T.A. Falba, S.V. Kast, H.M. Krumholz y E.H. Bradley. Sus resultados se pueden obtener en el National Institute of Health (NIH), PMC, 30 de marzo de 2007. Véase, además, The impact of late career job loss on myocardial infarction and stroke: a 10 year follow up using the health and retirement survey, 63 (Núm. 10) Occupational Environmental Medicine 683-678 (Oct. 2006).
Un equipo de investigadores de Estados Unidos que se dio a la tarea de perfeccionar la metodología existente para estimar los efectos de la pérdida de empleo involuntaria en la salud de las personas afectadas, encontró que los trabajadores desempleados desarrollan un estado de salud más precario que aquellos que se mantienen empleados. S.A. Burgard, J.E. Brand y J.S. House, Toward a Better Estimation of the Effect of Job Loss on Health, 48 (Núm. 4) J. Health Soc. Behav. 369-384 (Dec. 2007). Estos citan'los estudios de D. Dooley, J. Fielding y L. Levi, Health and Unemployment, 17 Annual Review of Public Health 449-465 (1996); J. Brand, The Effects of Job Displacement on Job Quality: Findings from the Wisconsin Longitudinal Study, 24 Research in Social Stratification and Mobility 275-298 (2006); H.S. Faber, Job Loss in the United States, 1981-2001”, Working Paper No. 9707, Cambridge, MA, National Bureau of Economic Research; J.S. House. Chronic Stress and Chronic Disease in Life and Work: Conceptuel and Methodological Issues, 1 Work and Stress, págs. 129-134 (1987).
Tras analizar los resultados de dos estudios longitudinales que duraron respectivamente quince y treinta y cinco años, los investigadores concluyeron que persiste una asociación significativa entre la pérdida involuntaria del empleo y el deterioro de la salud física y mental, luego de controlar todas las variables o factores que podrían influenciar los resultados.
“... Though limited in number, exiting longitudinal studies have shown that job loss is linked to a greater number of reported medical conditions, higher rates of use of medical services, and higher rates of use of pension disability benefits (Ferrie et al., 1998), as well as poorer physical functioning (Gallo et al., 2000) and increase in self-reported physical illness (Turner, 1995). Other longitudinal studies have also shown that job loss is associated with worsening of phychological symptoms such as depression, somatization and anxiety (Dooley, Catalano and Wilson).” J.E. Ferrie et al., An Uncertain Future: The Health Effects of Threats in Employment Security in While-Collar Men and Women, 88 (Núm. 1) Am. J. Public Health 1030-1036, (1998); Gallo et al., supra; J. Blake Turner, Economic Context and the Health Effect of Unemployment, Núm. 36, J. Health Soc. Behav. 213-229, (1995); Dooley, supra, según citado en Burgard, Brand y House, op. cit, pág. 371.

 Art. 2 de la Ley Núm. 278 de 15 de agosto de 2008, este artículo enmendó el artículo 10 de la Ley Núm. 80 de 1976, supra.

 El que la Asamblea Legislativa hubiese eximido al pago por despido de las deducciones de nóminas es incompatible con esta conclusión y con el propósito que persigue la citada Ley Núm. 80 de 1976 de beneficiar a losempleados despedidos.